Filed 4/24/15  P. v. Gomez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G048893 |
|       v. | (Super. Ct. No. 13NF0611) |
| DELFINO HERNANDEZ GOMEZ, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Carla Singer, Judge.  Affirmed.

Michael L. Guisti, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Sharon Rhodes and Karl T. Terp, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Defendant Delfino Hernandez Gomez appeals from his convictions after a jury trial. He contends the evidence does not support a great bodily injury enhancement or his conviction for false imprisonment and that he received ineffective assistance from his attorney. We affirm. The evidence supports his convictions and he failed to demonstrate counsel's performance adversely affected the outcome of the trial, even were we to assume counsel was ineffective.

I

FACTS

The information charged defendant with assault with force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4); count one; all undesignated statutory references are to the Penal Code) and disobeying a protective order (§ 166, subd. (a)(4), a misdemeanor; count two) on February 17, 2013, with assault with a deadly weapon (§ 245. subd. (a)(1); count three) on January 15, 2013, and false imprisonment by violence (§§ 236, 237, subd. (a); count four) on and between January 1, 2013 and February 17, 2013. It further alleged defendant inflicted great bodily injury during the commission of the assault with a deadly weapon charged in count three. The jury found defendant guilty on all four counts and found the great bodily injury enhancement true. The court sentenced defendant eight years eight months in prison, consisting of a four-year upper term on count three, a consecutive three-year term on the great bodily injury enhancement, and consecutive eight-month terms (one-third the midterm) on counts one and four.

We set forth the facts from the trial in compliance with the standard of review when a defendant challenges the sufficiency of evidence on appeal. (*People v. Lewis* (1990) 50 Cal.3d 262, 277 [we "presume in support of the judgment the existence of every fact the trier [of fact] could reasonably deduce from the evidence"].)

2

*Assault with Deadly Weapon (Count Three) and Great Bodily Injury Enhancement*

Defendant and his wife Terri had been married for five years by the time of the trial in this matter. They had a history of domestic violence dating from 2009. In 2009, Terri reported two instances of domestic violence to the police. She said defendant struck her in the head with a closed fist several times after an argument on May 10, 2009, and showed police photographs of her injuries from that incident. The second incident occurred on May 23, 2009. Terri said she and defendant got into an argument on that occasion and defendant struck her face several times with his cell phone. As a result of these incidents, a court issued a peaceful contact protective order.

In January 2013, defendant and Terri lived in their house in Buena Park. On January 15 (or the preceding two weeks), Terri stacked some metal racks on the outside of the house, by a bathroom window facing into the backyard. Some time after she had done so, defendant was in the backyard and called for her to come outside. He yelled at her and asked her why she stacked the racks there. She said she stacked them to save room. Terri said defendant was upset and frustrated. He told her stacking the racks at that location would make it easy for someone to climb through the window. He tossed the racks onto the grass, away from the windows of the house. Although Terri denied defendant threw one of the racks at her, she told a police officer defendant threw a rack at her. At the preliminary examination, she testified defendant threw a rack *at her*, but at trial she testified defendant was throwing the racks away from the house and was not trying to hit her. She claimed she used a "poor choice of words" when she said threw the rack at her.

When Terri held up her arms to deflect the oncoming rack, it struck her left arm, causing her pain. Terri went to the doctor because of the injury. Defendant went with her. He asked her to tell medical personnel it was an accident and not to make it into something they would inquire about. He said insurance would cover the injury if it was an accident. She subsequently saw an orthopedic specialist and her arm was placed

3

in a soft cast. Terri said her arm was painful for a couple of weeks and she had difficulty using her arm at first. She said she suffered nerve damage. "[I]t goes numb where it was hit." She did not have numbness in her arm before being hit with the rack. Terri said the injury healed quickly, but when the prosecutor confronted her with her testimony from the preliminary examination, Terri admitted her arm had not been back to normal by the time of the preliminary examination at the end of March 2013. She said she had full use of her arm and no pain when she testified at trial.

*Assault with Force Likely to Cause Great Bodily Injury (Count One)*

Terri's friend Tammy Osborne visited her in the middle of February 2013. Osborne arrived about around 5:00 or 6:00 p.m. and left about 7:30 or 8:00 that evening. Osborne had been asked to return later that night, but by the time she did, she felt it was too late to knock on the door, so she stayed in her van. About 3:00 a.m., Terri went out to Osborne's van and asked her to come inside the house. Osborne went inside and she, Terri, and defendant sat at the dining room table and talked. At one point, defendant told Terri to go to bed because he needed to speak with Osborne. Terri did as she was told and Osborne left a few minutes later because she felt uncomfortable about the situation.

Terri fell asleep before defendant entered the bedroom. She woke up when he entered the room and reached for her cell phone on her nightstand. She grabbed the cell phone and defendant grabbed her hand, squeezing it in an effort to get the phone. Defendant then grabbed her left arm which was still in the soft cast and twisted it while Terri was on the ground.

Terri said she rolled off the bed when she reached for the phone and at one point defendant had both arms around her. She admitted she told the responding police officer defendant choked her, she could not breathe, and she bit him in an effort to make him let go of her. Defendant's arm and the bite marks were photographed.

4

Terri lost consciousness from being strangled. She admitted she testified at the preliminary examination that defendant strangled her into unconsciousness. Afterward, her throat was sore and her voice was hoarse and raspy from the choking.

When Osborne left, she went to Del Taco and returned a few hours later. She knocked on the door. A few minutes later, as she was about to leave, Terri answered the door visibly shaken. Osborne noticed Terri "could hardly speak." Osborne asked what was wrong, and Terri said there had been an argument. Terri and Osborne went inside and sat at the kitchen table. Defendant started screaming at Osborne to leave. Osborne said she was there to see Terri, not him. Defendant started screaming even louder and Terri told him to stop yelling. Terri then walked into the bedroom and defendant followed. Osborne said she could see Terri and defendant in the bedroom standing face-to-face and she heard defendant yelling very loudly that Terri was stupid, the house was his, and Terri had nothing and never would. When it appeared defendant was about to lunge at Terri, Osborne stood up to leave and Terri asked her to call the police. Terri followed Osborne outside a few minutes later.

Outside the house, Osborne noticed the windows to the house were screwed shut and the heads of the screws had been cut off. She saw defendant get into his sister's truck and heard Terri tell him not to leave because the police were coming. Defendant told Terri to tell police he went for cigarettes and would be right back.

*False Imprisonment (Count Four)*

As of February 17, 2013, defendant had screwed shut the windows to the house. The only windows not screwed shut were the two that could not be reached from the ground. Defendant cut off the heads of the screws or scratched the tops so the screws could not be removed. Terri said defendant said he did so to keep anyone from going in and out of the windows. Defendant also changed the lock on the front door. He turned the dead bolt around so a key was required to open it from inside. Terri did not have a

5

key to open the dead bolt.  She said she could have left when defendant was gone if she removed the pins from the door's hinges.

Defendant told Terri she could not return if she left the house.  He also said he would get rid of everything, including her dogs, and leave her homeless if she left.  Additionally, he threatened to "kick [her] ass," although Terri claimed the threat was never made in the context of what would happen if she should left the house.  When he was home with Terri, defendant would put a screw in the lock so it could not be opened.  When defendant went to work, he took the screwdriver bits with him.  Terri said defendant did not flip the lock on the door just to keep her inside; he also did it to show others he could keep them out.  Terri told a detective defendant screwed the windows closed so she could not leave the house while he was gone from the house or sleeping.  She said defendant told her, "You're not going anywhere. This is [my] world."  She told police defendant kept her prisoner "24/7."

Terri said defendant started locking her inside the house in November 2012.  She admitted she testified at the preliminary examination that defendant threatened to have her chained to a bolt in the house.  He said he was treating her badly so she would "beg" him to put a bolt in the middle of the kitchen floor and chain her to it.

After the choking incident, Terri told Osborne she had to ask permission to leave the house and could not leave it when defendant was away from the house.  Terri explained that she could not leave when defendant was gone because the door was locked, the lock was "turned around," and she did not have the key to unlock the door from inside.

II

DISCUSSION

A. *Sufficiency of the Evidence*

"'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence

6

that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We must accept all assessments of credibility made by the trier of fact and determine if substantial evidence exists to support each element of the offense. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 387.) As an appellate court, we "'"must view the evidence in a light most favorable to [the prosecution] and presume in support of the judgment the existence of every fact the trier [of fact] could reasonably deduce from the evidence."' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) In other words, the fact the evidence *could* "reasonably be reconciled" with innocence does not permit an appellate court to reverse a conviction. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 200.)

1. *False Imprisonment*

Defendant contends the evidence does not support his conviction for false imprisonment. Although he set forth the standard of review to be applied in a sufficiency of the evidence challenge, he cites no other law in support of his one-paragraph argument. Instead, he argues the evidence demonstrates Terri was free to leave the house. He points out that Terri opened the door for Osborne during the February incident, for a detective who responded to the residence after that incident, and that the screws in the door were intended to keep people out. That is the sum total of his argument on the sufficiency of the evidence in connection with the false imprisonment charge. We address the issue rather than find the argument has been forfeited. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

"False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) The information alleged defendant falsely imprisoned Terri by means of violence, menace, fraud, and deceit. (See § 237, subd. (a).) The cases have held

7

threats may suffice as menace. (*People v. Matian* (1995) 35 Cal.App.4th 480, 485-486.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.) Thus, the fact there was evidence from which defense counsel could *argue* Terri was free to come and go, does not mean the jury was required to ignore contrary evidence, including her testimony the windows were screwed shut and the heads of the screws cut off so she could not leave the house; defendant told her if she left she could not return, he would get rid of her dogs, and leave her homeless; defendant turned the deadbolt lock on their front door around so a key was needed to exit the house, Terri did not have a key, and the only way she could get out of the house while defendant was gone would be to take the pins out of the door's hinges and remove the door; defendant told Terri she was "not going anywhere" because it was his "world"; and that defendant kept her a prisoner "24/7." This evidence, including defendant's threats to what would happen to Terri were she to leave, was sufficient to support the false imprisonment conviction.

2. *Great Bodily Injury*

The jury found the great bodily injury enhancement (§ 12022.7, subd. (a)) true in connection with the rack tossing incident charged in count three. To qualify as great bodily injury, the injury must be substantial, but need not be "'permanent,' 'prolonged,' or 'protracted' disfigurement, impairment, or loss of bodily function." (*People v. Escobar* (1992) 3 Cal.4th 740, 750.) Still, there is no requirement the victim suffer "external signs of significant trauma." (*People v. Wyatt* (2010) 48 Cal.4th 776, 785.) "[T]he determination of great bodily injury is essentially a question of fact, not law. "'Whether the harm resulting to the victim . . . constitutes great bodily injury is a

8

question of fact for the jury.  [Citation.]  If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might be reasonably reconciled with a contrary finding."'  [Citations.]"  (*People v. Escobar*, *supra*, 3 Cal.4th at p. 750, fn. omitted.)

Based on the following paragraph in his opening brief, it appears defendant contends the evidence does not support the enhancement:  "No one in this case, including the officer who responded to the scene immediately and detective following up on the charges saw any injuries to [Terri].  Simply, there was no injury to [Terri]."  Again, conflict in the evidence does not require reversal.  The great bodily injury enhancement is supported by Terri's testimony.  She said she went to the doctor because of the injury she suffered to her left arm when defendant threw the metal rack at her.  Her arm was placed in a soft cast and she was prescribed pain medication.  She was in pain for a couple of weeks after the incident.  As a result of the incident, she said her arm "goes numb where it was hit," and she did not have that problem before the incident.  The injury had not healed by the time of the preliminary examination held approximately two months after the injury was suffered.  There is sufficient evidence Terri suffered great bodily injury.[1]

Defendant argues neither police nor Osborne saw any injuries to Terri.  Aside from the fact a conflict in the evidence does not necessitate a finding of insufficient evidence (*People v. Lewis* (2001) 26 Cal.4th 334, 361), and section 12022.7, subdivision (a) does not require a visible external injury (*People v. Wyatt*, *supra*, 48 Cal.4th at p. 785), defendant's assertion that Osborne and police officers who responded to the residence on February 17, did not see any injuries on Terri's neck and they would have had she been choked, is irrelevant.  The great bodily injury enhancement was alleged in connection with the assault on or about January 15, not the assault, including the alleged choking, that took place a month later on February 17.

---

[1] Although the Attorney General twice refers to Terri having suffered a fracture to her arm, the brief contains no citation to the record on appeal.

9

B. *Ineffective Assistance of Counsel*

A criminal defendant has a federal and state constitutional right to the effective assistance of counsel. (U.S. Const., 6th & 14th Amends; Cal. Const., art. I, § 15.) There is no substantive difference between the federal and state constitutional right. (*People v. Doolin* (2009) 45 Cal.4th 390, 421.) "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process. [Citation.] The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. [Citations.]" (*Kimmelman v. Morrison* (1986) 477 U.S. 365, 374-375.)

"Defendant has the burden of proving ineffective assistance of counsel. [Citation.] To prevail on a claim of ineffective assistance of counsel, a defendant '"must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice."' [Citation.] A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. [Citation.] Moreover, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

Defendant bases his ineffective assistance of counsel claim on statements the trial judge made to defense counsel during the trial: "[Defense counsel], you're

10

leaving the court with the impression that you're not thinking about the objections you're making as opposed to pursuing a particular strategy. This is because the questions to which you are objecting are generally eliciting answers that compared to prior statements are certainly favorable to the defense. . . . [¶] . . . [¶] You did make a hearsay objection that I overruled because clearly the question asked for what appeared to be a prior inconsistent statement. And let me make it more clear. In the court's mind, it was an exploration of a prior inconsistent statement of which there are many coming from this witness. Your relevance objections have not been meritorious. They go to charges. They go to specific charges. And I have overruled those. [¶] . . . [¶] One thing I want to make clear to both of you is that this court has come to the conclusion that [Terri] is a hostile witness. I don't have enough information to determine whether every time she says 'I don't remember' she's telling the truth or she's deliberately lying. But I do know that she's mitigating what happened. And she is trying to be a defense witness. And she is embellishing statements that she previously gave in order to reduce the severity of her prior statements. . . . And pursuant to Evidence Code section 767 and the authorities thereunder, I am going to be overruling leading questions."

Even were we to assume counsel made objections that reasonably competent counsel would not have made, those objections were overruled and the result was the admission of favorable defense evidence. Thus defendant fails to demonstrate how the objections prejudiced his case.

Defendant claims counsel failed to follow-up with questions that may have benefited him. However, he does not attempt to demonstrate what favorable evidence, if any, would have been brought to light by any follow-up questions. He has not, therefore, demonstrated any prejudice from the alleged failure to ask follow up questions. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267 [appellate court should not find ineffective assistance of counsel without development all facts relevant facts in the record].) We therefore reject defendant's ineffective assistance of counsel claim.

11

### III

### DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.